# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| DBW PARTNERS, LLC | : | | |
|     d/b/a THE CAPITOL FORUM | : | | |
| | : | | |
|     Plaintiff, | : | Civil Action No.: | 18-3127 (RC) |
| | : | | |
|     v. | : | Re Document Nos.: | 11, 12 |
| | : | | |
| UNITED STATES POSTAL SERVICE and | : | | |
| UNITED STATES POSTAL SERVICE | : | | |
| OFFICE OF INSPECTOR GENERAL | : | | |
| | : | | |
|     Defendant. | : | | |

## MEMORANDUM OPINION

### DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

This case arises from two separate but related Freedom of Information Act ("FOIA") requests by DBW Partners, LLC, doing business as the Capitol Forum, a subscription news service. The requests, directed at the United States Postal Service ("USPS") and the USPS Office of Inspector General ("OIG"), both concerned the USPS's Postage Reseller Program. In response to the first request, the USPS stated that it was not obligated to search for any responsive records and that it could neither confirm nor deny that such records existed (that is, it issued what is called a "*Glomar* response"). In response to the second, the OIG initially withheld a requested report and later, after this litigation began, produced a heavily redacted version. The USPS and OIG moved for summary judgment, arguing that they fulfilled their obligations under FOIA. The Capitol Forum filed a cross-motion for summary judgment arguing that this was not

the case.  Because the Court finds that the USPS and USPS OIG did not carry their burdens

under FOIA, the Court denies their motion and grants the Capitol Forum's motion in part.

## II.  FACTUAL BACKGROUND

The Capitol Forum is a self-described "subscription news service providing

comprehensive coverage of competition policy and in-depth market and political analysis of

specific transactions and investigations."  Compl. ¶ 7, ECF No. 7.  Two FOIA requests that it

submitted in 2018 form the basis for this litigation.  Both relate generally to the USPS's Postage

Reseller Program and Negotiated Service Agreements ("NSAs")—which allow companies to

resell USPS services at discount prices—and to the USPS's relationship with Stamps.com, a

private company whose business model relied on participating in the Postage Reseller Program.

*See id.* ¶¶ 1–2.

To a large extent, the Capitol Forum's interest in the Postage Reseller Program and NSAs

stems from a series of events in the summer of 2017.  In July of that year, USPS's Chief

Customer and Marketing Officer James Cochrane agreed to sit down for a broadcasted interview

with a representative of Stamps.com.  *See* Williams Decl. Ex. O, ECF No. 12-3.  Originally

scheduled for August 2, it was rescheduled to July 30 at Stamps.com's request.  *Id.* at 1; *see also*

Defs.' Resp. to Pl.'s Statement of Undisputed Material Facts ("SOMF") ¶ 8, ECF No. 14-1.

During the interview, Cochrane spoke favorably about the Postage Reseller Program, saying that

"we thought resellers were an excellent opportunity," that "resellers have been a very effective

addition to the Postal Service portfolio," and that "we looked at resellers and things like PC

Postage providers, like Stamps.com . . . as excellent partners on bringing the best solution to

customers."  Defs.' Resp. to Pl.'s SOMF ¶ 8, ECF No. 15-1.  The interview was posted on

Stamps.com's blog on August 1.  *Id.* ¶ 9.  On August 2, Stamps.com held an earnings call with

its investors, during which Stamps.com executives referred to Cochrane's comments during the July 30 interview.  Williams Decl. Ex. P.

The Capitol Forum insinuates that this whole sequence of events raises ethical questions. It suggests that the call date was moved up in order to make sure that Cochrane's message of support and enthusiasm could be highlighted on the August 2 earnings call.  It also observes that Stamps.com's stock price rose by thirty-six percent in the two days following the release of Cochrane's statements—translating to a $978 million increase in the company's value.  Williams Decl. ¶ 30.  These gains disappeared over the course of 2018 as the Postage Reseller Program received more scrutiny from the USPS OIG, from Congress, and in the press.  *See id.* ¶¶ 31–32; Williams Decl. Ex. R.

That scrutiny began not long after Cochrane's interview with Stamps.com.  On September 17, 2017, the USPS OIG informed Cochrane that it "plan[ned] to research postal partnerships, particularly in the mail service provider area" and that this could include "the reseller and PC Postage programs" as well as "private sector best practices for such partnerships."  Williams Decl. Ex. Q.  The OIG produced a report, titled "Postal Partnerships: The Complex Role of Middlemen and Discounts in the USPS Package Business" (the "OIG Whitepaper" or the "Whitepaper") which, according to reporting by the Capitol Forum, criticized the USPS's lack of oversight of its contracts with its partners and estimated that reseller programs and NSAs were costing the USPS over $1 billion annually.  Williams Decl. Ex. R. The Capitol Forum has also produced emails between USPS ethics officials, with one official forwarding a transcript of Cochrane's remarks in the interview to another, who agreed with the former that the two should "discuss this."  Williams Decl. Ex. C.  From this, the Capitol Forum infers that an ethics review must have been conducted.  *Id.* at 4.

One of the FOIA requests at issue was sent to USPS on October 23, 2018 and sought "[a]ny documents or communications related to an ethics investigation and/or ethics review of former [USPS] Chief Customer and Marketing Officer James Cochrane" between July 1, 2017 and October 23, 2018. Williams Decl. Ex. A. The USPS responded with a *Glomar* response. Williams Decl. Ex. B. It cited Exemption 6 to FOIA, which allows an agency to withhold "personnel files and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." *Id.* (citing 5 U.S.C. § 552(b)(6)). The agency explained that it could not even acknowledge whether responsive records existed because "[a]cknowledging the existence or nonexistence of investigative records would compromise the individual's personal privacy interest because it would confirm whether the Postal Service investigated the individual's conduct." *Id.* at 2. The Capitol Forum appealed the denial of its FOIA request, and the appeal was denied on December 19, 2018. Compl. Ex. A.

The other request, sent on July 26, 2018, sought a copy of the OIG Whitepaper detailing USPS's work with resellers and NSAs. Williams Decl Ex. U. The agency withheld the Whitepaper, citing Exemption 3 to FOIA, which allows an agency to withhold records "specifically exempted from disclosure by statute . . . if that statute . . . establishes particular criteria for withholding or refers to particular types of matters to be withheld." Williams Decl. Ex. V (quoting 5 U.S.C. § 552(b)(3)). The agency pointed to a provision of the Postal Reorganization Act establishing that the USPS was not obligated to disclose "information of a commercial nature, including trade secrets, whether or not obtained from a person outside the Postal Service, which under good business practice would not be publicly disclosed." *Id.* (quoting 29 U.S.C. § 410(c)(2)). The Capitol Forum appealed the denial of this FOIA request as well, and the appeal was denied on September 10, 2018. Compl. Ex. B.

DBW Partners brought this FOIA suit against the USPS and the USPS OIG on December 28, 2018. Compl. After this suit was filed but before moving for summary judgment, USPS produced to the Capitol Forum a heavily redacted version of the Whitepaper. Nickoski Decl. Ex. H at 41–82, ECF No. 11-3. Both parties then moved for summary judgment. Defs.' Mot. for Summ. J., ECF No. 11; Pl.'s Cross-Mot. for Summ. J., ECF No. 12. Both motions are now ripe for review.

## III. ANALYSIS

### A. Legal Standard

FOIA "sets forth a policy of broad disclosure of Government documents in order 'to ensure an informed citizenry, vital to the functioning of a democratic society.'" *FBI v. Abramson*, 456 U.S. 615, 621 (1982) (quoting *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978)). The Act mandates release of properly requested federal agency records, unless the materials fall squarely within one of nine statutory exemptions. *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011); *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 833 (D.C. Cir. 2001) (citing 5 U.S.C. § 552(a)(3)(A), (b)). Additionally, FOIA "requires that even if some materials from the requested record are exempt from disclosure, any 'reasonably segregable' information from those documents must be disclosed after redaction of the exempt information unless the exempt portions are 'inextricably intertwined with exempt portions.'" *Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002) (citing 5 U.S.C. § 552(b); *Mead Data Cent., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977)). Exemptions must be "narrowly construed," and "conclusory and generalized allegations of exemptions are unacceptable." *Prop. of the People, Inc. v. Office of Mgmt. & Budget*, 330 F.

Supp. 3d 373, 380 (D.D.C. 2018) (quoting *Morley v. CIA*, 508 F.3d 1108, 1114–15 (D.C. Cir. 2007).

"FOIA cases typically and appropriately are decided on motions for summary judgment." *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009) (citing *Bigwood v. U.S. Agency for Int'l Dev.*, 484 F. Supp. 2d 68, 73 (D.D.C. 2007)). An agency is entitled to summary judgment if no material facts are genuinely in dispute and the agency demonstrates "that its search for responsive records was adequate, that any exemptions claimed actually apply, and that any reasonably segregable non-exempt parts of records have been disclosed after redaction of exempt information." *Competitive Enter. Inst. v. EPA*, 232 F. Supp. 3d 172, 181 (D.D.C. 2017).[1] "This burden does not shift even when the requester files a cross-motion for summary judgment because 'the Government ultimately has the onus of proving that the documents are exempt from disclosure,' while the 'burden upon the requester is merely to establish the absence of material factual issues before a summary disposition of the case could permissibly occur.'" *Hardy v. ATF*, 243 F. Supp. 3d 155, 162 (D.D.C. 2017) (brackets omitted) (quoting *Pub. Citizen Health Research Grp. v. FDA*, 185 F.3d 898, 904–05 (D.C. Cir. 1999)).

To carry its burden, the agency must provide "a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of the withheld document to which they apply." *Elec. Privacy Info. Ctr. v. DEA*, 192 F. Supp. 3d 92, 103 (D.D.C. 2016) (quoting *Mead Data Cent.*, 566 F.2d at 251). The agency "cannot justify its withholdings on the basis of summary statements that

---

[1] The Capitol Forum has not challenged the adequacy of USPS's search for responsive records. However, because the Court is ruling that a *Glomar* response is not an appropriate response to the request for records of the ethics investigation, USPS will have to conduct an additional search for such records and the adequacy of that search could be challenged at a later date.

merely reiterate legal standards or offer 'far-ranging category definitions for information,'" *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 955 F. Supp. 2d 4, 13 (D.D.C. 2013) (quoting *King v. U.S. Dep't of Justice*, 830 F.2d 210, 221 (D.C. Cir. 1987)), but it "may rely on declarations that are reasonably detailed and non-conclusory," *Pinson v. U.S. Dep't of Justice*, 245 F. Supp. 3d 225, 239 (D.D.C. 2017); *see also Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (requiring that, to support summary judgment, agency affidavits must "demonstrate that the information withheld logically falls within the claimed exception, and . . . not [be] controverted by either contrary evidence in the record nor by evidence of agency bad faith" (quoting *Miller v. Casey*, 730 F.3d 773, 776 (D.C. Cir. 1984) (quotation omitted))). While reviewing courts should "respect the expertise of an agency," *Hayden v. NSA / Cent. Sec. Serv.*, 608 F.2d 1381, 1388 (D.C. Cir. 1979), courts review an agency's decision to withhold records *de novo* and will only endorse that decision if the agency's justification for invoking a FOIA exemption "appears 'logical' or 'plausible,'" *Pinson*, 245 F. Supp. 3d at 239 (quoting *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007)).

## B. Ethics Records

USPS issued a *Glomar* response to the Capitol Forum's request for records relating to any ethics investigation of Cochrane based on Exemption 6. This exemption permits the withholding of "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The analysis for this Exemption "requires, first, a determination of whether the document in question qualifies as 'a personnel, medical, or similar file[].'" *Judicial Watch, Inc. v. Dep't of the Navy*, 25 F. Supp. 3d 131, 140 (D.D.C. 2014) (alteration in original) (quoting *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1228 (D.C. Cir. 2008)). For purposes of this determination, the

term "similar files" is "construed broadly and is 'intended to cover detailed Government records on an individual which can be identified as applying to that individual.'" *Gov't Accountability Project v. U.S. Dep't of State*, 699 F. Supp. 2d 97, 105–06 (D.D.C. 2010) (quoting *Dep't of State v. Wash. Post. Co.*, 456 U.S. 595, 602 (1982)). The Capitol Forum has not disputed that the records it requested would be sufficiently similar to qualify. *See* Pl.'s Mem. of Law in Supp. of Cross-Mot. for Summ. J. and in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s MSJ") at 11, ECF No. 12-1.

The Court must next "determine whether there is a 'substantial' privacy interest in preventing the document[s'] disclosure." *Judicial Watch*, 25 F. Supp. 3d at 140 (quoting *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 874 (D.C. Cir. 1989)). "[U]se of the word substantial in this [FOIA] context, means less than it might seem. A substantial privacy interest is anything greater than a *de minimis* privacy interest." *Multi Ag Media*, 515 F.3d at 1229–30. If a substantial privacy interest is identified, then the Court must then "determine whether [the records'] disclosure 'would constitute a clearly unwarranted invasion of personal privacy'" within the meaning of the statute. *Id.* at 1228 (quoting 5 U.S.C. § 552(b)(6)). This requires "balanc[ing] the privacy interest that would be compromised . . . against any public interest in the requested information." *Id.*; *see also Sullivan v. Veterans Admin.*, 617 F. Supp. 258, 260 (D.D.C. 1985) (describing two steps to the balancing analysis: first, "identify[ing] the nature and magnitude of the various interests involved" and second, "balancing these competing interests").

Further, to justify a *Glomar* response, "[t]he agency must demonstrate that acknowledging the mere existence of responsive records would disclose exempt information." *Elec. Privacy Info. Ctr. v. NSA*, 678 F.3d 926, 931 (D.C. Cir. 2012) (citing *Wolf*, 473 F.3d at 374). Put another way, "[a] *Glomar* response is valid 'if the fact of the existence of the agency

records falls within a FOIA exemption.'" *People for the Ethical Treatment of Animals v. NIH* ("*PETA*"), 745 F.3d 535, 540 (D.C. Cir. 2014) (quoting *Wolf*, 473 F.3d at 374). A *Glomar* response can be justified based on agency affidavits containing "reasonable specificity of detail rather than merely conclusory statements" so long as they are not "called into question by contradictory evidence in the record." *Id.* (quoting *Elec. Privacy Info. Ctr.*, 678 F.3d at 931). If a *Glomar* response is so justified, the agency is under no obligation to undertake any search for records. *Id.*

There can be little question that Cochrane has a significant—meaning more than *de minimis*—privacy interest in the records of any ethics investigation and also in the fact of their existence. This Circuit has recognized the "'substantial' privacy interest held by 'the targets of law-enforcement investigations . . . in ensuring that their relationship to the investigations remains secret.'" *PETA*, 745 F.3d at 541 (quoting *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1174 (D.C. Cir. 2011)). The Circuit has further observed that "the same concerns exist in the context of non-criminal investigations" and, thus, that records of many kinds of investigations implicate substantial privacy interests for the subjects of those investigations. *Id.* (citing *McCutchen v. U.S. Dep't of Health & Human Servs.*, 30 F.3d 183, 187 (D.C. Cir. 1994)) (finding privacy interest in National Institute of Health investigation into animal treatment at state research laboratory); *see*, *e.g.*, *Kimberlin v. Dep't of Justice*, 139 F.3d 944, 948 (D.C. Cir. 1998) (finding same in Office of Professional Responsibility investigation into an Assistant U.S. Attorney); *Chang v. Dep't of Navy*, 314 F. Supp. 2d 35, 43–44 (D.D.C. 2004) (finding same in records of non-judicial punishment proceedings against a naval officer).

Two considerations weaken Cochrane's privacy interest somewhat. First, he was a government official during the relevant time period, which means he "may have a somewhat

diminished privacy interest," but with the caveat that government officials "do not surrender all rights to personal privacy when they accept a public appointment." *Quiñon v. FBI*, 86 F.3d 1222, 1230 (D.C. Cir. 1996).  Second, some of the facts that could be revealed by responsive records are already matters of public record.  *See Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice* ("*CREW*"), 840 F. Supp. 2d 226, 233 (D.D.C. 2012) ("[G]eneral principles of privacy have far less force in [a] case [where] the information . . . is already a matter of public record.").  For instance, it is undisputed that Cochrane was interviewed and spoke favorably about Stamps.com, and an email has been produced showing ethics officials discussing his actions.  However, "the fact that an event is not wholly private does not mean that an individual has no interest in limiting disclosure or dissemination of the information." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 770 (1989) (quotations omitted). Although Cochrane's privacy interest is thus weakened, neither of these concerns cuts against him strongly enough to eliminate it entirely, and so it remains more than *de minimis*, and the Court proceeds to consider the public interest.

"[T]he relevant public interest under FOIA is the extent to which disclosure of requested files would serve the core purpose of the FOIA, which is contributing significantly to public understanding of the operations or activities of the government." *Multi Ag Media*, 515 F.3d at 1231 (quotations and alterations omitted); *see also PETA*, 745 F.3d at 524 ("[T]he only cognizable public interest under FOIA is 'the citizens' right to be informed about what their government is up to.'") (quoting *Reporters Comm.*, 489 U.S. at 773).  The public interest is, therefore, narrow in scope, but when it comes to records of an investigation, it can take a few different forms: "[f]or example, the public may have an interest in knowing that a government investigation itself was comprehensive, that the report of an investigation released publicly is

accurate, [or] that any disciplinary measures imposed are adequate . . . ." *Stern v. FBI*, 737 F.2d 84, 92 (D.C. Cir. 1984).

Cochrane—as Chief Customer and Marketing Officer—held a high-ranking position in the context of the USPS. He was certainly a higher-ranked government official than the researchers in *PETA*, 745 F.3d at 538, or the "staff-level government lawyer" in *Kimberlin*, 139 F.3d at 949. He is not as high-ranking a government official, though, as the U.S. Representative and Committee Chair in *CREW*, 840 F. Supp. 2d at 228, 231, nor have his actions garnered as much public attention as the maritime collision that prompted the non-judicial punishment proceedings in *Chang*, 314 F. Supp. 2d at 44 ("The . . . incident led to an investigation by the National Transportation Safety Board, two suits in admiralty . . . an internet website providing pictures of the damage and substantial media coverage."). Some details of Cochrane's conduct are public knowledge, but there has been no official acknowledgment of an investigation. In *PETA* the D.C. Circuit noted that "official acknowledgment" by the government of complaints or investigations "would carry an added and material stigma" for the subjects of the complaints and thus carries "special significance." *PETA*, 745 F.3d at 542.

Defendants, however, are also mistaken in arguing that the information requested by the Capitol Forum does not implicate the public interest at all because it relates only to "an isolated episode regarding a former employee and would not shed any light on how the agency is performing its statutory duties or carrying out its mission." Mem. of Law in Supp. of Defs.' Mot. for Summ. J. ("Defs.' MSJ") at 8–9, ECF No. 11-1. A specific request does not mean there is no public interest and, indeed, narrow requests are generally easier for agencies and courts to deal with than broad ones. *Cf. Benavides v. Drug Enf't Admin*, 968 F.2d 1243, 1249 (D.C. Cir. 1992) ("A district court has discretion . . . to avoid overly broad fishing expeditions." (quotations

omitted)).  Likewise the fact that the request focused on "an isolated episode" is not dispositive.  In the past, the fact that a single incident or a single investigation was the focus of a FOIA request has not counted against the requestor in the public interest balancing.  *E.g.*, *Chang*, 314 F. Supp. 2d at 43–44 (analyzing, under the Privacy Act, the disclosure of one officer's non-judicial punishment records stemming from a single incident).  Additionally, it has not been established that this event was "isolated."  A request about a single investigation can still shed light on government operations—either the operations under investigation or the operations of the investigation itself.  *Stern*, 737 F.2d at 92.  Finally, "the mere fact that records pertain to an individual's activities does not necessarily qualify them for exemption" because "[s]uch records may still be cloaked with the public interest if the information would shed light on agency action."  *Nation Magazine, Wash. Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 894–95 (D.C. Cir. 1995).

Defendants also point to *PETA*, Defs.' MSJ at 9, in which the D.C. Circuit held that a *Glomar* response was acceptable for a FOIA request seeking "materials related to all [National Institute of Health ("NIH")] investigations into complaints" regarding three particular NIH-funded researchers at a state university.  *PETA*, 745 F.3d at 541.  *PETA* is distinguishable on two significant grounds from the instant case.  First and foremost, *PETA* was decided under FOIA Exemption 7(C), which protects "records or information compiled for law enforcement purposes" if disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  *Id.* (quoting 5 U.S.C. § 552(b)(7)).  Although invocations of Exemption 7(C) are analyzed through a similar balancing of public and private interests, Exemption 6 has a different standard, one that tilts more strongly in favor of disclosure and requires that records be turned over unless the invasion of personal privacy would be "clearly unwarranted."  *Stern*, 737

F.2d at 91 ("Exemption 7(C) places a greater emphasis on protecting personal privacy than does Exemption 6 . . . ."); *Wash. Post Co. v. U.S. Dep't of Health & Human Servs.*, 690 F.2d 252, 261 (D.C. Cir. 1982) ("Under Exemption 6, the presumption in favor of disclosure is as strong as can be found anywhere in the Act.").  Second, the individuals whose privacy was at risk in *PETA* were not government officials, but state employees who merely received federal funding.  *See PETA*, 745 F.3d at 538.  Their research was government-funded, but it was not government activity in any meaningful sense.  *Id.* at 524 (noting that "whether private individuals conduct animal research in an appropriate manner . . . does not speak directly to *governmental* activity.").

Given this balancing of the private and public interests implicated, the Court is unable to conclude that a *Glomar* response was appropriate.  The Court does not find it "logical" or "plausible," *Wolf*, 473 F.3d at 375, for the USPS to suggest that it would be a "clearly unwarranted" invasion of privacy, *Stern*, 737 F.3d at 91, to even *acknowledge* the existence of records relating to an ethics review of Cochrane.  Cochrane was a high-ranking official relative to his agency, making his privacy interested minimal, though not *de minimis*.  There is a significant public interest in how he carried out his duties.  The records requested by the Capitol Forum would shed light on how the USPS responds when a high-ranking official interacts in the ways Cochrane did with leadership of a private corporation that does business with the government.  Cochrane was never as prominent a figure as the Representative in *CREW* and his actions did not garner as much attention as the naval accident in *Chang*, but this does not mean that he did not give up some of his right to privacy by taking a high-level role in the government or that the public lacks an interest in his actions.  If the public interest side of the Exemption 6 balancing depends too much on the profile of the subject of the request, or on the amount of interest that the public has shown before any disclosures are made, FOIA would become a

significantly weakened means for public oversight of government operations. FOIA would become largely ineffective with respect to lower-profile federal agencies like the USPS or instances of government misbehavior that has not yet garnered media attention. The public's interest does not have to be broad to be significant.

The public interest here is bolstered by the fact that Cochrane's interactions with Stamps.com— almost certainly the subject of any ethics investigation that produced responsive records[2]—go to the core purpose of FOIA. An investigation into the sequence of events laid out by the Capitol Forum would shed light on what the Postal Service is up to. Any ethics investigation would necessarily concern the Postal Service's relationships with its private partners and whether those relationships are handled in the best interest of taxpayers. The ethics investigation that is the obvious focus of the request does not center on Cochrane's personal conduct, such as alleged mis-use of a government vehicle or an inappropriate relationship with a subordinate. Fewer privacy interests are raised when, as here, the allegedly unethical conduct relates to agency operations and not merely to personal conduct.

For these reasons, as to the ethics investigation records, the Court denies Defendants' Motion for Summary Judgment and grants Plaintiff's Cross-Motion for Summary Judgment. The government did not meet its burden and has not established that Exemption 6 justified a categorical *Glomar* response. The Court therefore orders that USPS conduct a search for responsive documents and produce any responsive documents within thirty days of the date of

---

[2] The Court recognizes that the Capitol Forum requested records of any ethics investigation between certain dates rather than focused on particular subject matter. At the same time, the request is clearly focused on Cochrane's interactions with Stamps.com and on the ethics review that the Capitol Forum has reason to believe was conducted during the relevant time period. The Court sees no reason to ignore such obvious realities in considering the USPS's response. Of course, the Court also does not mean to rewrite the Capitol Forum's FOIA request to limit its scope. To the extent that any other ethics investigations of Cochrane occurred in the relevant time period, these would also be responsive.

this opinion.  Plaintiffs may then file a response to these updated submissions within twenty-one days.

## C.  OIG Whitepaper

The USPS OIG initially withheld the entirety of the OIG Whitepaper on the basis of Exemption 3.  Compl. ¶ 19.  Under Exemption 3, an agency can withhold from disclosure matters that are "specifically exempted from disclosure by statute," provided that the statute either "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue" or "establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3)(A).  For this exemption, then, the agency must "show [1] that the statute claimed is one of exemption as contemplated by Exemption 3 and [2] that the withheld material falls within the statute."  *Larson v. Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009) (citing *Fitzgibbon*, 911 F.2d at 761–62).  The USPS OIG relies on the Postal Reorganization Act, which specifically exempts from disclosure under FOIA "information of a commercial nature, including trade secrets, whether or not obtained from a person outside the Postal Service, which under good business practice would not be publicly disclosed."  39 U.S.C. § 410.  The Capitol Forum has not disputed that the Postal Reorganization Act is a withholding statute under Exemption 3.  *See* Pl.s' MSJ at 16.

After this litigation began, the USPS OIG produced to the Capitol Forum a heavily redacted version of the Whitepaper, Nickoski Decl. Ex. H ("Whitepaper"), ECF No. 11-3 at 41–82, accompanied by a one-page *Vaughn* index, Martin Decl. Attach. 1, ECF No. 11-4 at 5.  After this partial production, the USPS OIG argues that it has met its burden, Defs.' MSJ at 11–14, and the Capitol Forum makes three arguments to the contrary: (1) that the Whitepaper is not exempt from disclosure; (2) that, even if some portions are exempt from disclosure, more portions of it

are nonetheless segregable; and (3) that the *Vaughn* index created by the USPS OIG is insufficient. *See* Pl.s' MSJ at 16–21.

The Capitol Forum's first argument, that the Whitepaper as a whole is not exempt from disclosure can be disposed of fairly easily. The USPS OIG has produced a declaration by Dennis Nicoski, USPS's Director of Field Sales Strategy and Contracts, explaining the need to withhold the OIG Whitepaper. *See* Whitepaper. The Nicoski Declaration explains that NSAs are customized contractual agreements between USPS and particular mailers, that the terms of these contracts are subject to mutual nondisclosure agreements, and that these terms of are kept secret to maintain competitive advantages for USPS. *Id.* ¶¶ 11, 14, 18. According to the declaration, it is not just the terms of these agreements that the USPS would like to keep secret; even simply "[k]nowing how the Postal Service thinks about such contracts, discusses such contracts or otherwise acts surrounding such contracts could provide another company with a competitive advantage." *Id.* ¶ 13. The Capitol Forum attacks the Nicoski Declaration as "unsupported," "highly conclusory," and "speculative." Defs.' MSJ at 16. The Court disagrees. The Declaration is based on Nicoski's personal knowledge, Nicoski Decl. ¶ 2, and it is further supported by the Declaration of Elizabeth P. Martin, ECF No. 11-4, Counsel to the Inspector General for the USPS, which explains that the Whitepaper was produced by the OIG's Risk Analysis Research Center, "a component of the OIG that conducts in-depth reserch and analysis on postal issues to identify opportunities for revenue growth and increased operational efficiencies," *id.* ¶ 3. Even though the Declarations describe the OIG Whitepaper at a high order of abstraction, the Court does not find it at all implausible that the Whitepaper contains information that is properly withheld under the Postal Reorganization Act.

Plaintiffs also argue that, insofar as the existence or terms of particular NSAs are either publicly known or easily discernable, these may not be withheld. *E.g.*, Pl.'s MSJ at 17, ECF No. 12-1. This argument fails because, as this Court has explained, the relevant provision of the Postal Reorganization Act, 39 U.S.C. § 410(c)(2) is relatively broad. *See Airline Pilots Ass'n, Int'l v. U.S. Postal Serv.*, No. 03-cv-2384, 2004 WL 5050900 at *6 (June 24, 2004). The Act was designed to make USPS function more like a modern, competitive business. *See Am. Postal Workers Union AFL-CI v. U.S. Postal Serv.*, 742 F. Supp. 2d 76, 82 (D.D.C. 2010) (citing *Franchise Tax Bd. V. U.S. Postal Serv.*, 467 U.S. 512, 519–20 (1984)). In it, "Congress, specifically delineat[ed] the circumstances under which FOIA does not apply to USPS, [and] used the words 'good business practice.'" *Airline Pilots Ass'n*, 2004 WL 5050900 at *6 (citing 39 U.S.C. § 410(c)(2)). This language designates a broad swath of documents as protected, as most modern businesses would not publicize sensitive trade information even if it was already public in some limited form. The Court, therefore, need not consider in any detail the Capitol Forum's proffered declaration concerning technology that allows NSA price information to be discerned by scanning package barcodes. *See* Def's MSJ at 1; Lodhia Decl., ECF No. 12-4.

The more difficult questions are whether the USPS OIG properly segregated those portions of the OIG Whitepaper that it was required to produce from those that are exempt from production, and, relatedly, whether the *Vaughn* index accompanying the production is sufficiently detailed. To meet its burden on segregability, a government agency must usually submit a sufficiently detailed *Vaughn* index for each document and an affidavit or declaration stating that it has released all segregable material. 5 U.S.C. § 552(b) ("Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt."); *see Johnson*, 310 F.3d at 776 (citing *Armstrong v.*

*Exec. Office of the President*, 97 F.3d 565, 578–79 (D.C. Cir. 1996)) ("The combination of the *Vaughn* index and the affidavits . . . are sufficient to fulfill the agency's obligation to show with 'reasonable specificity' why a document cannot be further segregated."). An agency does not necessarily need to produce a *Vaughn* Index in every FOIA suit. Rather, an agency "may carry its burden of properly invoking an exemption by submitting sufficiently detailed affidavits or declarations, a *Vaughn* index of the withheld documents, or both." *Hardy v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 243 F. Supp. 3d 155, 162 (D.D.C. 2017) (citing *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013)). Regardless of how an agency carries its burden, the bottom line is that, as a matter of law, "FOIA itself places the burden on the agency to sustain the lawfulness of specific withholdings in litigation." *Nat. Res. Def. Council v. Nuclear Regulatory Comm'n*, 216 F.3d 1180, 1190 (D.C. Cir. 2000); *see also* 5 U.S.C. § 552(a)(4)(B).

The OIG Whitepaper produced to the Capitol Forum is indeed very heavily redacted. *See* Whitepaper. It comprises forty-two pages, a full thirty of which are redacted in their entirety, and several that are not entirely redacted reveal merely vague headings, single sentences left unredacted, or contact information at the bottom of a page. *See id.* Of course, "no genuine dispute is shown merely because a released record was heavily redacted. *Plunkett v. Dep't of Justice*, 924 F. Supp. 2d 289, 304 (D.D.C. 2013). If the agency "show[s] with reasonable specificity why material could not be segregated," through affidavits, declarations, and a *Vaughn* index, the agency "meets its burden under FOIA." *Billington v. U.S. Dep't of Justice*, 301 F. Supp. 2d 15, 23 (D.D.C. 2004) (citing *Armstrong*, 97 F.3d at 579). If the USPS was reasonably specific in explaining why so much of the document either was or could not be segregated from "information of a commercial nature, including trade secrets . . . which under good business

practice would not be publicly disclosed," 39 U.S.C. § 410, it may meet its burden notwithstanding the heavy redactions.

Although the Nicoski and Miller Declarations adequately explain that the OIG Whitepaper contains *some* commercial information that falls under the FOIA exception in the Postal Reorganization Act, they do not explain with reasonable specificity how so much of the Whitepaper could plausibly contain such information and they do not describe any review of the document for reasonably segregable non-exempt material. The Nicoski Declaration describes what NSAs are, why they are important, and why USPS cannot disclose their terms or the agency's broader "thought processes, procedures and tactics with regard to NSAs."[3] Nicoski Decl. ¶ 19, *see id.* ¶¶ 11–19. It then explains that the USPS management determined the OIG Whitepaper contained protected commercial information and that it could not be disclosed, and that, at the start of litigation, it agreed to take another look and "did unredact and produce certain information that in its view would not pose a risk of disclosing particular NSAs, the Postal Service's thoughts, actions, or other internal workings . . . and associated business decisions." *Id.* ¶¶ 22–24. The Miller Declaration provides background about the OIG Risk Analysis Research Center, which produced the Whitepaper, and reiterates that the Whitepaper was not

---

[3] The Court observes that not all "thought processes, procedures and tactics" are necessarily exempt under the Postal Reorganization Act. It is "good business practice" for a company to keep some of these things secret, but most modern businesses are willing to publicly explain, for instance on quarterly earnings calls, at least some of their strategic decisions and future plans. The Postal Service, too, has explained some of its goals and priorities, including in a 2017 hearing before the House of Representatives' Committee on Oversight and Government Reform, cited in the OIG Whitepaper. Whitepaper, ECF No. 11-3 at 54 n.48 (citing *Accomplishing Postal Reform in the 115th Congress – H.R. 756, The Postal Service Reform Act of 2017: Hearing before the Committee on Oversight and Government Reform*, House of Representatives, 115th Cong., 1st Sess. (February 7, 2017) (statement of Megan Brennan, Postmaster General and Chief Executive Officer of USPS), https://docs.house.gov/meetings/GO/ GO00/20170207/105526/HHRG-115-GO00-Transcript-20170207.pdf). In assessing whether to withhold certain "thought processes, procedures and tactics," the Postal Service must make that assessment within the context of what it has already said publicly about such matters.

published on the OIG website because it contained commercial information and that "OIG deferred to the view of USPS Management and declined to disclose the whitepaper in response to the Capitol Forum's FOIA request" for the same reason.  Miller Decl. ¶ 6.  The *Vaughn* index itself provides the least information of all.  It contains a single entry, which indicates simply that the OIG Whitepaper was partially withheld on the basis of Exemption 3 and the Postal Reorganization Act.[4]

Considering that the existence of USPS Reseller Programs and NSAs are already public knowledge, it is implausible that the OIG Whitepaper does not contain at least somewhat more segregable non-exempt information than what the USPS OIG has already revealed.  While the Nicoski Declaration and, to a lesser extent, the Miller Declaration explain why commercial information in the Whitepaper cannot be revealed, the USPS OIG has provided little to no evidence suggesting or explaining that whatever non-exempt information remains below the current redactions is so "inextricably intertwined with exempt portions," *Mead*, 566 F.2d at 260, that there are no further "reasonably segregable portion[s]" that it is obligated to produce, 5 U.S.C. § 552(b).  All the Court is told is that "the Postal Service did unredact and produce *certain information* that in its review would not pose a risk of disclosing" exempt information. Nicoski Decl. ¶ 24 (emphasis added).  This does not explain whether the Defendants have unredacted and produced *all information* that would not risk disclosing exempt information, as required by FOIA.  5 U.S.C. § 552(b); *compare*, *e.g.*, *Adoinser v. Dep't of Justice*, 811 F. Supp. 2d 284, 295 (D.D.C. 2011) (finding that all reasonably segregable non-exempt material was

---

[4] The fact that this *Vaughn* index does not help the agency carry its burden is not dispositive because agencies are under no obligation to produce a *Vaughn* index at all.  It is only one of several means by which an agency may carry its FOIA burden.  *Hardy*, 243 F. Supp. 3d at 162 ("An agency may carry its burden of properly invoking an exemption by submitting sufficiently detailed affidavits or declarations, a *Vaughn* index of the withheld documents, or both . . . .").

released based in part on a declaration stating that "[a]ll responsive page were examined [by the agency] to determine whether any reasonably segregable information could be released").

Further, although the Capitol Forum does not raise this concern, the Court notes that the USPS OIG's redactions are internally inconsistent. For instance, one page containing some unredacted text is a table of contents for the report. Whitepaper, ECF No. 11-3 at 42. Most headings are redacted, but some have been revealed, including for example "Management of Channel Partnerships," located at page 9 of the Whitepaper, and "OIG Recommendations," located at page 18. *Id.* But pages 9 and 18 of the report are redacted in their entirety, without even the previously revealed heading visible. *Id.* at 51, 60. Conversely, on page 17 of the report, USPS OIG has revealed the heading "Concerns Regarding Sales Partners," along with a paragraph of text, *id.* at 59, but in the table of contents, no entry for page 17 has been left unredacted, *id.* at 42. In light of the length of the document and the relative paucity of unredacted portions, these inconsistencies, though minor, are noticeable and do suggest a less-than-precise review of which portions of the report could have been produced without disclosing exempt information. This adds to the Court's conviction that the agency has not met its burden of explaining its withholdings and segregability review with reasonable specificity.

Where an agency fails to meet its burden, FOIA provides courts "a host of procedures" to determine whether records should be turned over, including discovery, further agency affidavits, and *in camera* review of the records in question. *Allen v. CIA*, 636 F.2d 1287, 1298 (D.C. Cir. 1980), *abrogated on other grounds by Founding Church of Scientology of Wash., D.C., Inc. v. Smith*, 721 F.2d 828, 830– 31 (D.C. Cir. 1983). A combination of the latter two are appropriate here, given that a single document of moderate length is at issue. *Id.* The Court exercises its "broad discretion" and orders submission of the OIG Whitepaper within thirty days for *in*

*camera* review, along with updated justifications for the any exemptions. *Id.* at 1297; *see*

*Graham v. Mukasey,* 247 F.R.D. 205, 207 (D.D.C.2008) (citing *Weissman v. CIA,* 565 F.2d 692,

698 (D.C. Cir.1977)) (stating, in a FOIA case, that *in camera* review is appropriate "where the

record is vague or the agency claims [are] too sweeping or suggestive of bad faith"). The USPS

OIG's updated justifications may come in the form of new agency affidavits or a revised *Vaughn*

index discussing particular redactions in more detail. *See Vaughn v. Rosen*, 484 F.2d 820, 826–

28 (D.C. Cir. 1973). Plaintiffs may then file a response to these updated submissions within

twenty-one days. Accordingly, as to the OIG Whitepaper, the Defendants' Motion for Summary

Judgment is denied, and the Plaintiff's Motion for Summary Judgment is granted in part and

denied in part.[5]

## IV.  CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment is DENIED and

Plaintiff's Cross-Motion for Summary Judgment is GRANTED IN PART AND DENIED IN

PART. An order consistent with this Memorandum Opinion is separately and

contemporaneously issued.

Dated:  October 28, 2019                                       RUDOLPH CONTRERAS
                                                              United States District Judge

---

[5] The Capitol Forum also asks the Court to assess litigation fees and costs against the
USPS and USPS OIG. Compl. ¶¶ 31, 35; Pl.'s MSJ at 21–22; *see* 5 U.S.C. § 552(a)(4)(E)
(stating that a court may "assess . . . fees and other litigation costs . . . in any case under this
section in which the complainant has substantially prevailed"). The Court agrees with the
Defendants that this request for fees and costs is "premature" at this stage because the Capitol
Forum has not yet established that it has "substantially prevailed." Reply in Supp. of Defs.' Mot.
for Summ. J. and Opp'n to Pl.'s Cross-Mot. for Summ. J. at 10, ECF No. 14.